# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

—————————

m 01-20610
m 01-21255

—————————

KENNETH FORD, DR.,

Plaintiff-Appellant,

VERSUS

NYLCARE HEALTH PLANS OF THE GULF COAST, INC., ET AL.,

Defendants,

AETNA U.S. HEALTHCARE, INC.,
A TEXAS CORPORATION;
THE METRAHEALTH CARE PLAN OF TEXAS, INC.;
THE METRAHEALTH INSURANCE COMPANY;
UNITED HEALTHCARE INSURANCE COMPANY, INC.;
AETNA U.S. HEALTHCARE, INC.,
A PENNSYLVANIA CORPORATION,

Defendants-Appellees.

—————————————

Appeals from the United States District Court
for the Southern District of Texas

—————————————

August 1, 2002

Before SMITH, BENAVIDES, and
PARKER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

I.

Kenneth Ford is an orthopedic surgeon who has contracted with various health maintenance organizations ("HMO's") as a specialist. In May 1996, he sued the defendant HMO's, claiming multiple causes of action stemming from their allegedly deceptive advertising. All of Ford's claims were dismissed over a period of several years.

Ford now appeals two of the district court's rulings: its 1999 decision to deny class certification to a proposed Lanham Act plaintiff class of all certified physicians who have contracted with the defendant HMO's, and its 2001 summary judgment dismissing Ford's individual Lanham Act false advertising claim on the ground that he lacks prudential standing.

Ford contends that the HMO's have used false advertising that claims that their management techniques improve health care quality and that they allow patients and doctors to make their own treatment decisions. Ford argues that the defendants' cost-control measures undercut quality and "ration" medical careSSsometimes against the will of doctors and patients. Ford contends that the defendants' cost-control policies reduce the incomes of doctors, including his own. He also claims that, by attracting new customers to the HMO's' health plans, the allegedly deceptive advertising further reduces doctors' incomes because it increases the HMO's' market power over the price of medical services. We affirm the dismissal of Ford's claims for lack of Article III standing.

II.
A.

The relevant portion of the Lanham Act provides for a cause of action as follows:

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, whichSS

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (1994). The district court held that Ford lacks prudential Lanham Act standing under this section. *See Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560-62 (5th Cir.) (outlining test for determining prudential Lanham Act standing),

2

*cert. denied*, 122 S. Ct. 329 (2001). Although Article III constitutional standing was not raised by the parties or considered by the district court, we must—where necessary—raise it *sua sponte*. *SEC v. Forex Asset Mgmt., LLC*, 242 F.3d 325, 328 (5th Cir. 2001).[1]

---

[1] In his special concurrence, Judge Benavides contends that this case should be decided on the basis of Lanham Act prudential standing rather than Article III constitutional standing, because the parties did not have an opportunity to brief the latter. This issue ignores the fundamental point that wherever possible, Article III standing must be addressed before all other issues "because it determines the court's fundamental power even to hear the suit." *Rivera*, 283 F.3d at 319. In the absence of Article III standing, we have no right to opine on issues of prudential standing.

The Third Circuit has explicitly recognized that Lanham Act prudential standing cannot be addressed so long as Article III standing remains in doubt, because "[c]onstitutional standing is a threshold issue that we should address before examining issues of prudential standing." *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 175 (3d Cir. 2001). Although the special concurrence attempts to distinguish *Joint Stock* on its facts, the Third Circuit did not rest its holding—that Article III standing should be addressed first—on the specifics of the case before it, but instead adopted this principle as a broad general rule. We see no reason to create a circuit split on this issue.

Even if we did have the authority to forego consideration of Article III standing, there would be no need to exercise it. As the special concurrence recognizes, "to the extent that identical issues have already been raised in the litigation, the threat of procedural prejudice is greatly diminished." In this litigation, the issue of (continued...)

Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

> [The irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent not conjectural or hypothetical . . . Second, there must be a causal connection between the injury and the conduct complained of . . . Third, it must be likely, as opposed to merely

---

[1](...continued)
causation that is central to our holding on Article III standing was extensively contested as part of the ongoing dispute over Lanham Act prudential standing.

In any inquiry into Lanham Act prudential standing, the court must weigh "(1) the nature of the plaintiff's alleged injury: Is the injury of a type that Congress sought to redress in providing a private remedy for violations of the [Lanham Act]?; (2) the directness or indirectness of the asserted injury; (3) the proximity or remoteness of the party to the alleged injurious conduct; (4) the speculativeness of the damages claim; and (5) the risk of duplicative damages or complexity in apportioning damages." *Procter & Gamble,* 242 F.3d at 562. Causation is undeniably relevant to at least the second, third, and fourth prongs of this test, and defendants have consistently argued that Ford lacked prudential standing in part because he failed to provide adequate evidence of causation.

Despite this repeated challenge, Ford has not provided evidence demonstrating that he has suffered even a small loss as a result of defendants' advertising. He therefore has failed to meet his burden to "set forth by affidavit or other evidence specific facts" validating his right to standing. *Lujan*, 504 U.S. at 561 (citations omitted).

speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61 (quotations omitted).

"The party invoking federal jurisdiction"§§Ford§§bears the burden of proof in establishing all three elements. *Id.* at 561. "Failure to establish any one [of them] deprives the federal courts of jurisdiction to hear the suit." *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002). At the summary judgment stage, "the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts" validating his right to standing. *Lujan*, 504 U.S. at 561 (citations omitted). The question of Article III standing must be decided prior to the prudential standing and class certification issues raised in this appeal, "because it determines the court's fundamental power even to hear the suit."[2] *Rivera*, 283 F.3d at 319.[3] Ford cannot prove the causation necessary to establish Article III standing.

---

[2] As we noted in *Rivera*, "there is a limited exception for suits in which the class certification issues are "'logically antecedent to the existence of any Article III issues.'" *Rivera*, 283 F.3d at 319 n.6 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997)); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (same). This exception does not apply here, however, for the same reason it was inapplicable in *Rivera*: "In the instant case, in contrast to *Ortiz* and *Amchem*, the standing question would exist whether [the plaintiff] filed h[is] claim alone or as part of a class; class certification did not create the jurisdictional issue." *Rivera*, 283 F.3d at 319 n.6.

[3] *Cf. Joint Stock Soc'y*, 266 F.3d at 175 (holding that Article III "constitutional standing" must be addressed before considering Lanham Act "prudential standing").

B.

Ford claims that his injury consists of a reduction in his income from his medical practice caused by the defendants' restrictive cost-containment policies, which allegedly have the effect of reducing payments to contract specialists. He contends that the HMO's have been able to lower their payments to contract physicians as a result of increased market power gained by attracting patients through deceptive advertising. This argument fails to satisfy the causation prong of standing.

To meet the causation requirement, Ford would have to present evidence affirmatively proving that the reduction in his income was a consequence of the HMO's' restrictive policies and that those policies in turn were established or at least made more onerous as a result of increased market power created by the acquisition of new customers through the defendants' allegedly deceptive ads.[4] Nothing in the record establishes the validity of either of the two links in this causal chain, and Ford must provide evidence of both if he is to establish the causation necessary for Article III standing. Otherwise, he cannot show that his injury is "fairly traceable to the challenged action of the defendant." *Lujan*, 555 U.S. at 560 (quotations and ellipses omitted).

There is no evidence in the record to show that Ford's income has in fact declined any more than would be expected as a result of events completely unrelated to the HMO's' activities. When asked by opposing counsel

---

[4] *See Joint Stock Soc'y*, 266 F.3d at 178 (holding that Article III standing for a Lanham Act false advertising claim is lacking where the plaintiff's injuries cannot be traced to the defendants' challenged advertisements "but are rather the result of an independent cause").

4

whether he "could identify a single patient you lost as a result of the defendants' ads," Ford admitted that he could not. There is also no evidence demonstrating that Ford ever received a lower payment for his services than he would have in the absence of the advertisements.

In its ruling denying Ford's petition for class certification, the district court noted that, during the 1992-96 period, Ford's income did indeed decline, but the income of all of his partners went up. *Ford v. NYLCare Health Plans, Inc.*, 190 F.R.D. 422, 426 (S.D. Tex. 1999). The district court also pointed out that some or all of the decrease in Ford's income might have been a result of the fact that "he is not employed full time as a physician . . . and spends a significant period of time filming a fishing show for a sports network." *Id.* Ford bears the burden of proving otherwise, and he has not met it.[5]

AFFIRMED.

_____

[5] *See Johnson v. Bd. of Regents of the Univ. of Ga.*, 263 F.3d 1234, 1268 (11th Cir. 2001) (holding that "a plaintiff cannot serve as a class representative if she lacks standing to advance the class's claim").

FORTUNATO P. BENAVIDES, Circuit Judge, Specially Concurring:

Although I would reach the same result as the majority, I write separately because I would base my analysis not on Article III standing, but on prudential standing under the Lanham Act. As the majority notes, Article III has never been raised as an issue in this case. It was never briefed by the parties, questioned by the district court, or even mentioned at oral argument. The parties did not have the benefit of a hearing to present evidence on the issue. Nevertheless, despite the complete absence of any suggestion that Article III standing might be deficient, the majority requires Dr. Ford to have adduced evidence of causation between the alleged false advertising and his asserted economic injury. Concluding that he has not met this burden, it holds that Article III standing is lacking.

Of course, the jurisdictional issue of standing may be raised *sua sponte* despite the parties' failure to raise it. *Henderson v. Stalder*, 287 F.3d 374, 379 n.5 (5th Cir. 2002). The burden of establishing standing, which rests on the party invoking federal court jurisdiction, varies depending upon the stage at which standing becomes an issue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). At the pleading stage, we look only to the sufficiency of the allegations. *Id.* "In response to a summary judgment motion, however, t he plaintiff can no longer rest on such 'mere allegations,'" but must adduce evidence in support of the elements of standing. *Id.* (quoting Fed. R. Civ. P. 56(e)). At the final stage of the litigation, standing must be supported adequately by the evidence offered at trial. *Id.*

Citing *Lujan* for support, the majority assumes that the summary judgment standard should govern even when the issue is raised *sua sponte* by an appellate court without notice to the parties. *Lujan*, however, does not go so far. It holds only that the summary judgment standard is appropriate in

reviewing a party's "*response to a summary judgment motion*." *Id.* (emphasis added). This distinction is significant because it implicates concerns of notice and fairness. If the defendant challenges standing in a motion for summary judgment, then the plaintiff is able to direct the court to the evidence that supports federal jurisdiction. Similarly, if the court provides an opportunity for briefing after the issue is raised *sua sponte*, there is no risk of unfairness to the plaintiff. By contrast, if the appellate court raises the issue *sua sponte* without notice to the parties, the plaintiff is deprived of a meaningful opportunity to address the court's concerns by identifying record evidence to satisfy the standing requirements. *Cf. St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 435 (5th Cir. 2000) (requiring the district court to provide party with ten days notice and opportunity to respond before summary judgment is entered *sua sponte*).

In situations where a party has not been afforded an opportunity to respond to a court's *sua sponte* concerns about standing, it would be unfair to broaden review beyond the sufficiency of the pleadings. For example, in *Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994), the Eleventh Circuit confronted the issue of what standard to apply when the litigation had progressed beyond the stage of a motion to dismiss, but without any challenge to standing in the district court. In that case, the plaintiffs had obtained a preliminary injunction, but neither the defendants nor the district court ever questioned the existence of standing. The Eleventh Circuit recognized that although it was proper for the issue to be raised for the first time on appeal, "as a matter of fairness, the [defendant's] failure to question the plaintiffs' standing in the district court does affect the standard to which we will hold plaintiffs at this stage of the proceedings." *Id.* A plaintiff should be expected, without prodding from the court or the opposing party, to file a complaint that sufficiently alleges standing and to prove such facts at trial. Still, the Eleventh Circuit understood that "[i]t might well be unfair,

7

however, to impose a standing burden beyond the sufficiency of the allegations of the pleadings on a plaintiff seeking a preliminary injunction, unless the defendant puts the plaintiff on notice that standing is contested." *Id.* Accordingly, the court determined that the standing issue should be judged based on the allegations in the complaint. *Id.* I see no reason why this same concern about notice and fairness should not affect the standard of review at the summary judgment stage.

Certainly, in some cases it will make no difference which standard is applied to a *sua sponte* challenge to standing. In such cases, the potential for prejudice is *de minimis* because the party's response will be futile. For example, a review of the record by the appellate court might indicate that there is an independent factor that precludes the plaintiff from ever demonstrating that his injury flows from the defendant's wrongful conduct. Such a factor was present in *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164 (3d Cir. 2001), which is cited by the majority. In *Joint Stock*, the Third Circuit affirmed a district court's determination that constitutional standing was lacking in a Lanham Act false advertising case brought by producers of Russian vodka against the American makers of the "Smirnoff" brand of vodka. *Id.* at 168. The Russian producers alleged *inter alia* that the Americans were misrepresenting the origin and historical pedigree of their Smirnoff vodka, which in fact was made in the United States and not endorsed by the original Smirnov family. *See id.* at 177-78. Holding that there was no evidence of a causal connection between the asserted injury and the allegedly false ads, the court pointed to the fact that the plaintiffs did not have superior trademark rights to the Smirnoff brand, without which they could not have marketed their vodka in the United States under the Smirnoff name. *See id.* at 178. In light of this "independent cause," the Russian producers would be unable to use the Smirnoff name in the United States regardless of whether the American makers were engaging in false advertising. *See id.* In cases like *Joint Stock*, where it will

8

be logically impossible to establish standing, there is no need to provide the party with an extra opportunity to identify evidence in support of a fatally flawed theory.

In other cases, prejudice will be minimized by the fact that the party has notice of the need to adduce evidence in support of Article III even though neither the court nor the defendant makes a formal motion. For example, in *Bischoff v. Osceola County, Fla.*, 222 F.3d 874, 882 n.8 (11th Cir. 2000), the Eleventh Circuit held that it was proper for the district court to apply a summary judgment standard on a *sua sponte* challenge to standing because the plaintiffs were on notice that standing was an issue, as they raised it themselves in briefs. Similarly, to the extent that identical issues have already been raised in the litigation, the threat of procedural prejudice is greatly diminished. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2d Cir. 2000) (recognizing reduced threat of procedural prejudice where court's *sua sponte* determination is based on issues identical to the raised by the moving party). In the present case, although defendants had already attacked Dr. Ford's prudential standing under the Lanham Act, this issue is not identical to constitutional standing under Article III.

Applying these principles to the present case, before reaching *sua sponte* the conclusion that Dr. Ford has not met his summary judgment burden, I would ask whether a response would be futile. Notwithstanding the majority's well-written and thoughtful analysis, I am unconvinced that affording Dr. Ford an opportunity to respond to our concerns about standing would be an exercise in futility. There is no dispute that Dr. Ford could survive a challenge to standing based solely on the sufficiency of his pleadings. His complaint alleges that the defendants have increased their customer base through deceptively false advertising, have leveraged that increased customer base to obtain lower fee arrangements for Dr. Ford's contract services, and have therefore caused him economic injury.

9

Clearly, these allegations satisfy the requirements of Article III. The issue, as the majority notes, is whether there is evidence to support these links in the causal chain. The majority cites several failings in the record evidence, but none of them are fatal to Dr. Ford's theory. It notes that in a deposition, Dr. Ford was unable to identify a single patient lost as a result of the HMOs' ads. Although such evidence would undoubtedly be helpful to his case, it is by no means a necessary element. In Lanham Act § 43(a) cases, it is often difficult, if not impossible, to point to specific evidence of lost sales. *See Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 316 (2d Cir. 1982) ("It is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement. Too many market variables enter into the advertising-sales equation."); *Grant Airmass Corp. v. Gaymar Indus., Inc.*, 645 F.Supp. 1507, 1514 (S.D.N.Y. 1986) (rejecting requirement that plaintiff must identify "a lost customer actually misled by the advertising literature"). This difficulty in identifying specific lost sales is further exacerbated by the immense complexity of the market at issue in this case. Decisions about plans and providers are influenced by a myriad of factors, and the ads are targeted at both the users (employees) and the purchasers (employers) of the managed care plans. It is not unsurprising, therefore, that Dr. Ford could not name a single lost patient, and his failure to do so certainly does not mean that standing is lacking.

Similarly, the fact that Dr. Ford now spends part of his time hosting a fishing show on a sports television network does not preclude standing. As the majority notes, this observation was part of the district court's analysis of Dr. Ford's petition for class certification. Specifically, it found Dr. Ford's television work relevant to the typicality issue under Fed. R. Civ. P. 23(a)(3), as Dr. Ford's economic situation might not be similar to that of the other putative class members. *See Ford v.*

10

*NYLCare Health Plans, Inc.*, 190 F.R.D. 422, 426 (S.D. Tex. 1999). Typicality aside, however, the possibility that Dr. Ford's income has declined due to an increase in the hours he spends fishing does not mean that he has not also suffered economic injury as a result of the defendants' false ads. Such evidence goes not to the existence, but the quantum of injury. All that is required for Dr. Ford to have standing is "an identifiable trifle" of an injury. *Assoc. of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999) (citations omitted). His work on the fishing program therefore is practically irrelevant to the standing issue.

In sum, I think it is premature to apply the summary judgment standard to Dr. Ford's standing under Article III. He has not been given an opportunity to identify the evidence in support of standing, and there has been no convincing argument that such an opportunity would be futile. Accordingly, I would not decide this case on Article III grounds, but would reach the same result by holding that Dr. Ford lacks prudential standing under the Lanham Act. Regardless of the oft-repeated maxim that Article III standing is jurisdictional and must be resolved prior to any analysis of the remaining issues in the case, "it is entirely appropriate to deny standing on prudential grounds if that course is easier, or more clearly right, than to rule on constitutional grounds first." 13A Charles Alan Wright, et al., *Federal Practice and Procedure*, § 3531.15 (2d. ed. Supp. 2002); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 92 (1998) (disapproving of "hypothetical jurisdiction" cases in which standing is assumed in order to address clear merits issue, but distinguishing "cases in which a statutory standing question was decided before a question of constitutional standing"). In this case, prudential standing was briefed by the parties and ruled on by the district court, so nothing prevents us from holding Dr. Ford to his burden of identifying evidence demonstrating a genuine issue of material fact on the issue.

11

I would conclude that Dr. Ford has failed to satisfy his summary judgment burden on the issue of prudential standing under the Lanham Act. In determining whether a plaintiff has prudential Lanham Act standing, we have recently adopted the test articulated by the Third Circuit in *Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 233-34 (3d Cir. 1998). *See Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 562-63 (5th Cir 2001) ("*P & G*"). Under this test, five factors are relevant to the prudential standing analysis: "(1) the nature of the plaintiff's alleged injury . . . (2) the directness or indirectness of the asserted injury; (3) the proximity or remoteness of the party to the alleged injurious conduct; (4) the speculativeness of the damages claim; and (5) the risk of duplicative damages or complexity in apportioning damages." *Id.* at 563. Although technically distinct, these five factors can be distilled into an essential inquiry, i.e., whether, in light of the competitive relationship between the parties, there is a sufficiently direct link between the asserted injury and the alleged false advertising. *Cf. id.* at 562 n.51 (citing Restatement (Third) of Unfair Competition § 3 cmt. f (1995)).

As the primary focus of the Lanham Act is on commercial harms that result from anti-competitive behavior, the first factor looks to the nature of the plaintiff's alleged injury. *See id.* at 563 (quoting *Conte Bros.*,165 F.3d at 234). Dr. Ford's asserted injury, while certainly a commercial harm, is competitive only in the most attenuated sense. He describes his injury as the lost income resulting from lower contract fees paid by HMOs. He attributes the HMOs' ability to demand such reductions to the increased bargaining power provided by a wider customer base, the fruits of the false advertising. Dr. Ford's essential complaint, therefore, is that the false ads are pulling customers away from plans that compensate him better and into HMOs, which secure reduced fee arrangements. The main *competitive* effect of the ads, therefore, is felt adversely by other insurance plans, not by Dr. Ford. He himself is hurt only because the HMOs then exploit their competitive advantage over other

12

plans to press physicians to accept lower compensation arrangements. Because this harm is only tangentially related to competition, it is not the "type that Congress sought to redress" in passing the Lanham Act. *See Conte*, 165 F.3d at 234 (citation omitted).

Turning to the second factor, we have never required a direct competitive relationship between the plaintiff and the defendant. In fact, the *Conte* test specifically rejected such a requirement. *See Conte*, 165 F.3d at 231-32. Instead, the central issue is whether a plaintiff has "a reasonable interest to be protected against false advertising." *Id.* at 231. Again, the complexity of the relationship between Dr. Ford and the HMOs cuts against Lanham Act standing. Even though a plaintiff can suffer a Lanham Act injury through indirect competition, such competition between Dr. Ford and the HMOs is so tenuous that it borders on the hypothetical. He does not provide health insurance and the HMOs do not provide direct patient care. In the absence of managed care plans, patients would come to Dr. Ford though traditional indemnity or fee-for-service insurance coverage. Theoretically, patients could seek his services without going through an insurance plan, but Dr. Ford has provided no evidence that such customers represent a significant portion of the market. In the absence of a group of consumers that would come to him directly but for the HMOs' deceptive ads, his injury is too indirect to support Lanham Act standing.

Applying the third factor, which looks to "the proximity of the party to the alleged injurious conduct," we have held that the justification for Lanham Act standing is diminished if there is "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest" by bringing a Lanham Act claim. *P & G*, 242 F.3d at 563 (citation omitted). As consumers do not have standing under the Lanham Act, they should be irrelevant to this analysis. *Cf. id.* at 563-64 (noting that consumers do not have standing under the Lanham Act and focusing on rights of

13

distributors).  Moreover, we need not take into account consumers' ability to sue for fraud.  Otherwise, as consumers would presumably almost always be able to bring an action for fraud, this factor would never counsel in favor of standing.  In the present case, however, Dr. Ford has presented no evidence that physicians are the only class of persons motivated to bring a Lanham Act claim.  Certainly, we should exclude from the possible alternatives other HMOs, as the ads in question tout the benefits of HMOs in general, not some specific companies over others.  Nevertheless, in the broader health insurance market, HMOs compete with other plans, including fee-for-service or preferred provider organizations (PPOs).  Dr. Ford has provided no evidence that to the extent that the defendants are making false claims about their HMO plans, purveyors of these other plans would not be motivated to sue under the Lanham Act.

The fourth factor, the speculative nature of the plaintiff's damages, is neutral at best for Dr. Ford.  As the district court noted, Dr. Ford dropped his damages claim after class certification was denied, but reserved it in the event that the district court's decision was reversed.  In his brief on appeal, he concedes that quantifying any damages would be a complex task.  Dr. Ford argues, however, that if only injunctive relief is at issue, this factor actually argues in favor of standing.  He relies on the Lanham Act doctrine that a plaintiff's inability to definitively quantify his damages should not preclude the granting of injunctive relief, as an injunction against false advertising benefits the public without causing an undeserved windfall for the plaintiff.  *See Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 618 (6th Cir. 1999).  This confuses the issue under the test for prudential standing, which "is to determine whether the plaintiff is 'a *proper* party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.'"  *Conte*, 165 F.3d at 225 (emphasis added) (quoting *Bender v. Williamsport Area Sch. Dist.*,

475 U.S. 534, 546 n.8 (1986)).  In other words, our focus in resolving Lanham Act standing issues is not whether the uncertain calculation of damages precludes injunctive relief at all, but whether *this particular plaintiff* should be allowed vindicate the public interest.  *See Joint Stock*, 266 F.3d at 184 (holding that plaintiffs may not circumvent the requirements for prudential standing by relying on forms of relief that benefit the public at large).  Accepting Dr. Ford's argument would essentially render this factor meaningless in every case where injunctive relief is sought, as any plaintiff would be able to cast himself as the "vicarious avenger of the general public's right to be protected against potentially false advertisements." *Id.* (internal quotations omitted).

Perhaps the strongest reason for denying prudential standing is the fifth factor's concern about "the risk of duplicative damages or the complexity of apportioning damages." *Id.*  Dr. Ford is but one of innumerable physicians who have contracted with the HMOs, and who therefore have probably lowered fees as a result of the HMOs' bargaining power.  If the HMOs' ads were determined to be false, all of these physicians would have damages claims.  Moreover, as Dr. Ford concedes, the calculation of these damages would be extremely complex.  Finally, doctors are not even the most direct victims of any allegedly false ads, which harm rival health plans more than contracting physicians.  In light of the complex and duplicative nature of such damages awards, the fifth factor militates strongly against prudential standing.

To summarize, Dr. Ford has suffered a commercial harm, but his injury is simply not the competitive harm that is protected by the Lanham Act.  Of the five factors that are relevant to this analysis, none counsels in favor of prudential standing.  Furthermore, there is nothing unfair or premature about resolving this case on prudential standing grounds and applying the more rigorous summary judgment standard, as Dr. Ford was fully aware of his burden to adduce evidence in support

15

of each element of prudential standing. Because I cannot say that he had a sufficient opportunity to address the majority's concerns about constitutional standing, I respectfully concur in the result only.